# EXHIBIT B

# Plaintiff's Ex Parte Application for Immediate Temporary Restraining Order and Motion for Preliminary Injunction

# (Feb. 17, 2026)

# EXHIBIT B

1  AARON D. FORD
   Attorney General
2  Jessica E. Whelan (Bar No. 14781)
   Chief Deputy Solicitor General—Litigation
3  John S. Michela (Bar No. 8189)
   Senior Deputy Attorney General
4  Sabrena K. Clinton (Bar No. 6499)
   Senior Deputy Attorney General
5  State of Nevada
   Office of the Attorney General
6  1 State of Nevada Way, Suite 100
   Las Vegas, NV 89119
7  (702) 486-3420 (phone)
   (702) 486-3773 (fax)
8  jwhelan@ag.nv.gov
   jmichela@ag.nv.gov
9  sclinton@ag.nv.gov

REC'D & FILED

2025 FEB 17 PM 12: 30

_____ SCOTT HOEN
               CLERK
BY_____
                        DEPUTY

10  *Attorneys for Plaintiff*

11          **IN THE FIRST JUDICIAL DISTRICT COURT OF**
12          **THE STATE OF NEVADA IN AND FOR CARSON CITY**

13  STATE OF NEVADA ex rel. NEVADA       Case No. 26 OC 00000050 · 1B
    GAMING CONTROL BOARD,
                                         Dept. No.      I
14          Plaintiff,

15  vs.

16  KALSHIEX, LLC,                       **PLAINTIFF'S *EX PARTE* APPLICATION
                                         FOR IMMEDIATE TEMPORARY RE-
17          Defendant.                   STRAINING ORDER AND MOTION FOR
                                         PRELIMINARY INJUNCTION**

18

19          Plaintiff, STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD ("BOARD"),

20  by and through its attorneys, hereby files this Application for Immediate Temporary Restraining Order

21  and Motion for Preliminary Injunction against KALSHIEX, LLC ("KALSHI"). The BOARD seeks to

22  immediately restrain and enjoin KALSHI and any of its agents, employees, officers, or affiliates from

23  operating a derivatives exchange and prediction market ("market") that offers event-based contracts re-

24  lating to sporting and other events to people within Nevada without obtaining all required Nevada gaming

25  licenses, and from allowing its market to accept wagers from persons under the age of 21 in Nevada. This

26  Application and Motion are made pursuant to NRCP 65 and are based upon the following Memorandum

27  of Points and Authorities, the Declaration of Jessica E. Whelan, all papers on file herein, and any oral

28  argument this Court permits.

Page **i** of **v**

# **TABLE OF CONTENTS**

Page

I. FACTS.................................................................................................................. 1

    A. The State Comprehensively Regulates Gaming in Nevada.................................... 1

    B. KALSHI's Market is a Gambling Game and/or Sports Pool and Accepts Wagers from Persons in Nevada. .................................................................................................. 2

    C. KALSHI's Activities in Nevada Cause Harm to Nevada. .................................... 2

II. PROCEDURAL HISTORY ................................................................................... 3

III. LEGAL STANDARD ............................................................................................ 6

IV. ARGUMENT ......................................................................................................... 7

    A. Plaintiff Is Likely to Succeed on the Merits of Its Claims. .................................. 7

    B. Plaintiff Is Suffering and Will Continue to Suffer Immediate and Irreparable Harm Absent Relief. ........................................................................................................ 8

    C. The Balance of Hardships and the Public Interest Weigh Heavily in Favor of Granting an *Ex Parte* Temporary Restraining Order and a Preliminary Injunction............................. 10

    D. No Security Is Required. ...................................................................................... 13

V. CONCLUSION ..................................................................................................... 13

Page **ii** of **v**

013

1

## TABLE OF AUTHORITIES

2  **Cases**                                                                                    **Page(s)**

3  *Elk Point Country Club Homeowners' Ass'n v. K.J. Brown, LLC,*
      138 Nev. 640, 515 P.3d 837 (2022) .................................................................. 6

4

5  *State ex rel. Friedman v. Eighth Jud. Dist. Ct. In & For Clark Cnty.,*
      81 Nev. 131, 399 P.2d 632 (1965) .................................................................... 7

6  *Goldman v. Newage Lake Las Vegas, LLC,*
      2019 WL 13254890 (D. Nev. Oct. 23, 2019) ................................................. 10

7

8  *Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming Comm'n,*
      984 F.2d 1507 (9th Cir. 1993) ....................................................................... 10

9  *Hughes Props. v. State,*
      100 Nev. 295, 680 P.2d 970 (1984) ................................................................. 1

10

11  *KalshiEX, LLC v. Hendrick,*
      2025 WL 1073495 (D. Nev. Apr. 9, 2025) ..................................................... 11

12  *KalshiEX, LLC v. Hendrick,*
      2025 WL 3286282 (D. Nev. Nov. 24, 2025) ............................................. *passim*

13

14  *LIT Ventures, LLC v. Carranza,*
      457 F. Supp. 3d 906 (D. Nev. 2020) ................................................................ 6

15

16  *N. Am. Derivatives Exchange, Inc. v. Nevada,*
      2025 WL 2916151 (D. Nev. Oct. 14, 2025) ..................................................... 4

17  *Posner v. U.S. Bank Nat'l Ass'n,*
      140 Nev. Adv. Op. 22, 545 P.3d 1150 (2024) ................................................. 6

18

19  *Robinhood Derivatives LLC v. Dreitzer,*
      2025 WL 3283308 (D. Nev. Nov. 25, 2025) ................................................... 4

20

21  *Sacco v. State,*
      105 Nev. 844, 784 P.2d 947 (1989) ........................................................ 12, 13

22  *Univ. & Cmty. Coll. Sys. of Nev. v. Nevadans for Sound Gov't,*
      120 Nev. 712, 100 P.3d 179 (2004) ................................................................. 6

23

24  **Statutes, Regulations, and Rules**

17 C.F.R. § 40.11(a) ....................................................................................... 11

25  NRS 33.010(1) .................................................................................................. 6

26  NRS 33.010(2) .................................................................................................. 6

27  NRS 463.0129(1)(a) .................................................................................... 1, 12

28

NRS 463.0129(1)(b) ........................................................................................................... 1

NRS 463.0129(1)(c) ..................................................................................................... 1, 11

NRS 463.0129(1)(d) ......................................................................................................... 11

NRS 463.140(1) ............................................................................................................ 1, 9

NRS 463.0152 ............................................................................................................... 1, 2

NRS 463.0153 ................................................................................................................... 1

NRS 463.160 ..................................................................................................................... 7

NRS 463.160(1) ................................................................................................................ 1

NRS 463.0193 ............................................................................................................... 1, 2

NRS 463.350 ............................................................................................................ 1, 7, 8

NRS 463.350(1)(a) .......................................................................................................... 12

NRS 463.362 ................................................................................................................... 12

NRS 463.370 ................................................................................................................... 12

NRS 463.373 ..................................................................................................................... 1

NRS 463.745 ..................................................................................................................... 9

NRS 463.01962 ............................................................................................................. 1, 2

NRS 465.086 ................................................................................................................. 7, 8

NRS 465.086(1) ................................................................................................................ 8

NRS 465.091 ..................................................................................................................... 8

NRS 465.092 ................................................................................................................. 7, 8

Nev. Gam'g Comm. Reg. 22.060(2) ................................................................................. 1

Nev. Gam'g Comm. Reg. 22.1205(2) ............................................................................ 2, 9

Nev. Gam'g Comm. Reg. 22.121 ...................................................................................... 9

NRCP 65(b) ................................................................................................................... 6, 7

NRCP 65(b)(2)(c) ........................................................................................................... 13

**Other Authorities**

@vegasstarfish, *Kalshi Taking Over Las Vegas*, YouTube (Feb. 5, 2026) ....................... 4

Anna Betts, *Prediction Market Kalshi Reached $1bn in Trading Volume During Super Bowl*, The Guardian (Feb. 10, 2026) ........................................................................................... 5

Ira Boudway & Denitsa Tsekova, *Kalshi Downloads Zoom Past Gambling Apps Ahead of Super Bowl*, Bloomberg (Feb. 5, 2026) ........................................................................................... 4

Danny Funt, *America's Betting Craze Has Spread to Its News Networks*, New Yorker (Dec. 12, 2025) ........................................................................................................... 12

Dustin Goucher, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025) ........................................................................................................... 12

Dustin Gouker, *The Handle: Inside Kalshi's First $10 Billion Month*, The Closing Line (Feb. 10, 2026) ........................................................................................................... 5

Dustin Gouker, *Kalshi Now Lets You Bet on Dozens of International Soccer and Basketball Leagues*, Event Horizon (Jan. 26, 2026) ............................................................................. 4

Kalshi Help Center, *Signing Up as an Individual* ........................................................... 3

KALSHI, *Kalshi Fee Schedule* ...................................................................................... 2, 8

KALSHI, *Men's College Basketball Champion*, https://perma.cc/J24E-BZ73 .................. 2

Sam McQuillan, *Super Bowl Betting Results Mask Game's Real Financial Story*, Legal Sports Report (Feb. 10, 2026) ................................................................................... 5

Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* (2025) ..................................... 1, 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.    FACTS**

    **A.    The State Comprehensively Regulates Gaming in Nevada.**

Nevada's gaming industry is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS 463.0129(1)(a). The gaming industry contributes over $2 billion in taxes—over one-third of Nevada's general fund. Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* 2 (2025), perma.cc/NRH9-5NGV. The Nevada Legislature has found that the continued growth and success of gaming "is dependent upon public confidence and trust that licensed gaming" is "conducted honestly and competitively." NRS 463.0129(1)(b). And the Legislature has made clear that "[p]ublic confidence and trust can only be maintained by *strict* regulation of all persons, locations, practices, associates, and activities related" to the operation of gaming in Nevada. NRS 463.0129(1)(c) (emphasis added). The BOARD is statutorily charged with administering and enforcing Nevada gaming law. NRS 463.140(1).

"Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS 463.0153. A "game" subject to regulation in Nevada includes "any game played with . . . equipment or any mechanical or electronic device or machine for money . . . or any representative of value" that is accessible in Nevada. NRS 463.0152. The games subject to regulation in Nevada include "percentage game[s]." *Id.* A "percentage game" exists where the "house" does not directly participate in a wager and its only stake is a commission derived from the wager. *See Hughes Props. v. State*, 100 Nev. 295, 297, 680 P.2d 970, 971 (1984). Gaming includes operating a "sports pool," which is "the business of accepting wagers on sporting events or other events by any system or method of wagering," NRS 463.0193; a "wager" is "a sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain," NRS 463.01962.

Nevada law comprehensively regulates entities that conduct gaming activities in the State. Every such entity is subject to a rigorous licensing process. NRS 463.160(1). They must pay taxes on gross gaming revenue derived from gaming activities accessible in the State. NRS 463.373. Licensed entities accepting wagers from persons in the State of Nevada must have a physical location in Nevada. Nev. Gam'g Comm. Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS 463.350. Further, licensed entities accepting wagers on sporting events must employ safeguards

1    to ensure that wagers are not being placed on an event by owners, coaches, players, or officials partici-

2    pating in the event, and must communicate with Nevada gaming regulatory authorities about potential

3    evidence of match fixing or point shaving. *See* Nev. Gam'g Comm. Reg. 22.1205(2). Being unable to

4    enforce these laws would severely weaken the State's ability to strictly regulate gaming and would jeop-

5    ardize the growth and integrity of Nevada's gaming industry.

6        **B.    KALSHI's Market is a Gambling Game and/or Sports Pool and Accepts Wagers
            from Persons in Nevada.**

7

8        KALSHI operates a market that offers event-based contracts relating to sporting and other events.

9    Compl. ¶ 20. These events include, but are not limited to, college basketball games, college and profes-

10    sional football games, and elections. *Id.*

11        KALSHI's contracts are wagers under NRS 463.01962: KALSHI's market allows persons located

12    in Nevada to risk money on sporting events and elections, and the outcomes of sporting events and elec-

13    tions are, by their very nature, uncertain. *See, e.g.*, KALSHI, *Men's College Basketball Champion*,

14    https://perma.cc/J24E-BZ73. It offers exactly the same type of wagers as licensed sportsbooks, including

15    prop bets (bets on outcomes within a game, such as the total number of points scored) and parlays

16    (chained bets on one or more outcome). As the federal court recognized, KALSHI's sports-related event

17    contracts "are sports wagers and everyone who sees them knows it." *KalshiEX, LLC v. Hendrick*, 2025

18    WL 3286282, at *8 (D. Nev. Nov. 24, 2025), *appeal pending*, No. 25-7516 (9th Cir. filed Nov. 25, 2025).

19    KALSHI consequently operates a "sports pool" under Nevada law. NRS 463.0193. Indeed, over ninety

20    percent of KALSHI's revenues are from sports contracts, and KALSHI advertises its products as "sports

21    betting." Compl. ¶¶ 20, 22. Further, KALSHI's market takes a commission, or percentage, on the wagers

22    placed through its market. *See* KALSHI, *Kalshi Fee Schedule*, perma.cc/BZ3L-MYM5. KALSHI ac-

23    cordingly offers a "percentage game"—a type of "gambling game"—under Nevada law. NRS 463.0152.

24        A person can access KALSHI's market through its website or mobile app. Compl. ¶ 18. KALSHI

25    uses computers and servers to make its event-based contracts available on its website and mobile app. *Id.*

26    A person enters into an event-based contract on KALSHI's market with the payment of money. *Id.*

27        **C.    KALSHI's Activities in Nevada Cause Harm to Nevada.**

28        Although KALSHI conducts gaming activity in Nevada, including by operating a sports pool,

Page **2** of **14**

018

1  KALSHI does not comply with Nevada gaming law. Among other things, KALSHI has not undergone

2  Nevada's rigorous licensing process to obtain a gaming license. Compl. ¶ 28. It accordingly does not

3  possess a Nevada license to conduct gaming activities, including operating a sports pool. *Id.* ¶¶ 40–41.

4  Further, KALSHI does not pay taxes on gross gaming revenue generated from wagers placed by persons

5  in Nevada. *Id.* ¶ 30. And KALSHI does not have a physical location in Nevada. *Id.* ¶ 32.

6      KALSHI also does not comply with the various regulations on gaming that Nevada has imposed

7  to protect Nevada and its citizens. KALSHI does not require its patrons to be at least 21 years of age to

8  place a wager in its markets, Compl. ¶ 34; instead, it allows anyone over the age of 18 to trade on its

9  platform, *see* Kalshi Help Center, *Signing Up as an Individual*, perma.cc/K7D8-GA8X. To Plaintiff's

10  knowledge, KALSHI does not employ adequate safeguards to ensure that wagers are not being placed on

11  an event by owners, coaches, players, or officials participating in the event, and does not communicate

12  about potential evidence of match fixing or point shaving to Nevada regulatory authorities. Compl. ¶ 36.

13  **II.    PROCEDURAL HISTORY**

14      On March 4, 2025, the BOARD issued KALSHI a letter to cease and desist offering contracts

15  based on sports and election events in Nevada unless and until it receives a license from the Nevada

16  Gaming Commission. Compl. ¶ 61. On March 28, 2025, KALSHI filed a complaint for permanent in-

17  junctive and declaratory relief in federal district court, alleging that the Commodity Exchange Act

18  preempts Nevada gaming laws. *See* Compl., *KalshiEX LLC v. Hendrick*, No. 25-cv-575 (D. Nev. Mar.

19  28, 2025) (ECF No. 1). KALSHI contemporaneously filed a motion for a preliminary injunction and

20  declaratory relief. *See* Mot., *KalshiEX*, *supra* (ECF No. 18). On April 9, 2025, the federal court granted

21  KALSHI's motion for a preliminary injunction. *See* Order, *KalshiEX*, *supra* (ECF No. 45). That injunc-

22  tion prohibited the BOARD from taking any action against KALSHI for its contracts in Nevada for the

23  time period when it was in effect.

24      On May 20, 2025, the BOARD issued North American Derivatives Exchange, Inc., d/b/a

25  Crypto.com ("Crypto.com") a letter to cease and desist offering contracts based on sports and election

26  events unless and until it receives a license from the Nevada Gaming Commission. *See* Compl. Ex. A, *N.*

27  *Am. Derivatives Exchange, Inc. v. Nevada* ("*Crypto.com*"), No. 25-cv-978 (D. Nev. June 3, 2025) (ECF

28  No. 1-2). On June 3, 3025, Crypto.com filed a complaint for permanent injunctive relief and declaratory

019

1  relief in federal district court, on the same legal grounds as KALSHI. *See* Compl., *Crypto.com*, *supra*

2  (ECF No. 1). Crypto.com also filed a motion for a preliminary injunction. *See* Mot., *Crypto.com*, *supra*

3  (ECF No. 15). The federal court denied Crypto.com's motion for a preliminary injunction. *See*

4  *Crypto.com*, 2025 WL 2916151 (D. Nev. Oct. 14, 2025), *appeal pending*, No. 25-7187 (9th Cir. filed

5  Nov. 14, 2025). Crypto.com has appealed. While the appeal is pending, Crypto.com has agreed not to

6  offer sports-based contracts to Nevada residents. *See* Notice, *Crypto.com*, *supra* (ECF No. 110).

7      On October 17, 2025, the BOARD filed a motion to dissolve KALSHI's preliminary injunction.

8  *See* Mot., *KalshiEX*, *supra* (ECF No. 142). On November 25, 2025, the federal court granted that motion

9  and dissolved the preliminary injunction that had prohibited the BOARD from enforcing Nevada gaming

10  law against KALSHI with respect to its sports and election contracts. *See KalshiEX*, 2025 WL 3286282.[1]

11  KALSHI has appealed the federal court's order dissolving the preliminary injunction, and that appeal

12  remains pending. On November 25, 2025, KALSHI filed a motion for an injunction pending appeal with

13  the district court, *See* Mot., *KalshiEX*, *supra* (ECF No. 238); the district court denied that motion, Order,

14  *KalshiEX*, *supra* (ECF No. 258). On December 17, 2025, KALSHI filed a motion for an injunction pend-

15  ing appeal with the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit"), Mot.,

16  *KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Dec. 17, 2025) (ECF No. 17); the Ninth Circuit has

17  not ruled on the motion.

18      During the pendency of its appeal, KALSHI dramatically expanded its operations. It started of-

19  fering bets on even more sporting events, including amateur soccer in Spain and the Japanese basketball

20  B League. *See* Dustin Gouker, *Kalshi Now Lets You Bet on Dozens of International Soccer and Basketball*

21  *Leagues*, Event Horizon (Jan. 26, 2026), perma.cc/448F-B2QL. It has also expanded its marketing push,

22  including by taking out an enormous billboard on the Las Vegas Strip to encourage betting on its platform

23  for the Super Bowl. *See* @vegasstarfish, *Kalshi Taking Over Las Vegas*, YouTube (Feb. 5, 2026), bit.ly/

24  4ku6iGb. Those efforts have led to a surge in users and trading volumes. In January, KALSHI's app was

25  downloaded over 3 million times—more than for both DraftKings or FanDuel combined. *See* Ira

26  Boudway & Denitsa Tsekova, *Kalshi Downloads Zoom Past Gambling Apps Ahead of Super Bowl*,

27

---

28      [1]   The Court also denied a preliminary injunction to KALSHI's partner, Robinhood Derivatives
LLC. *See Robinhood Derivatives LLC v. Dreitzer*, 2025 WL 3283308, at *2 (D. Nev. Nov. 25, 2025).

1  Bloomberg (Feb. 5, 2026), perma.cc/U2AF-ND5U. KALSHI's 30-day volume has hit over $10 billion

2  in wagers. Dustin Gouker, *The Handle: Inside Kalshi's First $10 Billion Month*, The Closing Line (Feb.

3  10, 2026), perma.cc/E4G5-6XLZ.

4       KALSHI reported over $1 billion in wagers on Super Bowl Sunday alone—over 27 times more

5  than it reported for the Super Bowl in 2025. Anna Betts, *Prediction Market Kalshi Reached $1bn in*

6  *Trading Volume During Super Bowl*, The Guardian (Feb. 10, 2026), perma.cc/KDU4-ER7R. In contrast,

7  betting volumes on the Super Bowl at Nevada's regulated sportsbooks declined nearly 15% from 2025,

8  hitting a ten-year low. Sam McQuillan, *Super Bowl Betting Results Mask Game's Real Financial Story*,

9  Legal Sports Report (Feb. 10, 2026), perma.cc/8HZX-MPWH. So KALSHI has massively expanded its

10  unlicensed gambling business, to the detriment of competitors that are licensed in Nevada.

11       During this period, the BOARD has filed civil enforcement actions in this Court against Block-

12  ratize Inc. d/b/a Polymarket, QCX LLC d/b/a Polymarket US, and Adventure One QSS Inc. d/b/a Poly-

13  market (collectively "Polymarket"), and Coinbase Financial Markets, Inc. ("Coinbase"), entities that, like

14  KALSHI, allow users to wager on sports and other events through event-based contracts. On January 29,

15  2026, Judge Woodbury entered a temporary restraining order against Polymarket, and on February 6,

16  2026, Judge Luis entered a temporary restraining order against Coinbase. *See Nevada v. Blockratize, Inc.*,

17  No. 26-OC-00012-1B (Nev. 1st JD Jan. 29, 2026) ("Polymarket Op."); *Nevada v. Coinbase Financial*

18  *Markets, Inc.*, No. 26-OC-00030-1B (Nev. 1st JD Feb 6, 2026) ("Coinbase Op."). The orders prohibit

19  Polymarket and Coinbase from offering event-based contracts on sporting and other events in Nevada

20  without gaming licenses. The courts held that Polymarket's and Coinbase's unlicensed operations likely

21  violate Nevada's gaming laws, that the Commodity Exchange Act likely does not preempt those laws,

22  and that Polymarket's and Coinbase's unlicensed operations cause immediate and irreparable injury to

23  the State of Nevada and the public. Polymarket Op. 4-6; Coinbase Op. 3-5.

24       On February 10, 2026, the BOARD informed the Ninth Circuit that it intended to file a civil

25  enforcement action in this Court on February 17, 2026. *See* Notice, *KalshiEX, LLC v. Hendrick*, No. 25-

26  7516 (9th Cir. Feb. 10, 2026) (ECF No. 60.1). On February 11, 2026, KALSHI filed a motion for an

27  administrative stay with the Ninth Circuit. The Ninth Circuit has not acted on that motion. Because the

28  federal district court dissolved the preliminary injunction, and neither the district court nor the Ninth

1    Circuit granted KALSHI an injunction pending appeal, the BOARD is no longer prohibited from exer-

2    cising its statutory duty to enforce Nevada gaming law against KALSHI.

3          On February 17, 2026, the BOARD filed this action to obtain a declaration from this Court that

4    KALSHI is violating Nevada law and an injunction ordering KALSHI to cease its violations of Nevada

5    law. *See* Compl. 11. In this Application for Immediate Temporary Restraining Order and Motion for

6    Preliminary Injunction, the BOARD seeks an *ex parte* temporary restraining order and preliminary in-

7    junction prohibiting KALSHI and any of its agents, employees, officers, or affiliates from operating a

8    market that offers event-based contracts relating to sporting and other events to people within Nevada

9    without obtaining the required Nevada gaming licenses, and prohibiting KALSHI from allowing its mar-

10   ket to accept wagers from persons under the age of 21 in Nevada. The BOARD seeks immediate, *ex parte*

11   relief because KALSHI's unlicensed and unregulated operation in the State of Nevada is causing signif-

12   icant harm to the State, its citizens, and its gaming industry, every day. *Id.* ¶¶ 26–36.

13   **III.    LEGAL STANDARD**

14         Nevada Rule of Civil Procedure 65(b) authorizes a court to issue an *ex parte* temporary restraining

15   order. Courts often apply similar standards for temporary restraining orders and preliminary injunctions,

16   as both are forms of injunctive relief aimed at preventing harm before a final resolution of the case. *See,*

17   *e.g.*, *LIT Ventures, LLC v. Carranza,* 457 F. Supp. 3d 906, 908 (D. Nev. 2020). A court should grant such

18   relief when it "appear[s] by the complaint that the plaintiff is entitled to the relief demanded, and such

19   relief or any part thereof consists in restraining the commission or continuance of the act complained of,"

20   NRS 33.010(1), and when "the commission or continuance of some act, during the litigation, would

21   produce great or irreparable injury to the plaintiff," NRS 33.010(2). The plaintiff must demonstrate two

22   elements: (1) there is a reasonable likelihood that the plaintiff will prevail in the underlying case and

23   (2) absent relief, the plaintiff will suffer irreparable harm for which compensatory damages are not suf-

24   ficient. *Elk Point Country Club Homeowners' Ass'n v. K.J. Brown, LLC,* 138 Nev. 640, 642, 515 P.3d

25   837, 839 (2022); *Posner v. U.S. Bank Nat'l Ass'n,* 140 Nev. Adv. Op. 22, 545 P.3d 1150, 1152 (2024).

26   The court may also consider the balance of hardships and the public interest. *See Univ. & Cmty. Coll.*

27   *Sys. of Nev. v. Nevadans for Sound Gov't*, 120 Nev. 712, 721, 100 P.3d 179, 187 (2004).

28         The key question in issuing a temporary restraining order is whether the Plaintiff has shown that

1  it will suffer "immediate and irreparable injury." NRCP 65(b); *see State ex rel. Friedman v. Eighth Jud.*

2  *Dist. Ct. In & For Clark Cnty.*, 81 Nev. 131, 134, 399 P.2d 632, 633 (1965).

3      The requirements for both a preliminary injunction and for a temporary restraining order are met

4  here. The BOARD is suffering serious, ongoing, irreparable harm every day that KALSHI operates in

5  violation of Nevada law, and so the Court should immediately issue a temporary restraining order.

6  **IV.    ARGUMENT**

7      KALSHI has been willfully circumventing Nevada law requiring all gaming activity in the State

8  to be strictly regulated and licensed. KALSHI operates a "sports pool" and/or "gambling game" under

9  Nevada law. Yet KALSHI does not possess a Nevada license to operate a sports pool or conduct other

10  gaming activity in Nevada. KALSHI also does not follow many of the restrictions on licensed gaming in

11  the State. In particular, KALSHI allows persons under 21 years of age to wager on its market. Accord-

12  ingly, the BOARD is entitled to a temporary restraining order and preliminary injunction prohibiting

13  KALSHI from operating an unlicensed sports pool in Nevada and prohibiting KALSHI from accepting

14  wagers from persons under the age of 21.

15      **A.    Plaintiff Is Likely to Succeed on the Merits of Its Claims.**

16      The BOARD is likely to succeed in showing that KALSHI violates, at a minimum, NRS 463.160,

17  463.350, 465.086, and 465.092.

18      KALSHI violates NRS 463.160. Pursuant to NRS 463.160, it is unlawful for a person to expose

19  a game or a sports pool for play in Nevada without the required gaming licenses. KALSHI's market

20  exposes a percentage game and/or sports pool for play in Nevada. Compl. ¶¶ 19–25; *see* Polymarket Op.

21  5; Coinbase Op. 3-4; *KalshiEX*, 2025 WL 3286282, at *8 (concluding that KALSHI's sports-related

22  event-based contracts "are sports wagers and everyone who sees them knows it"). KALSHI does not

23  possess a Nevada gaming license either to offer a percentage game or to operate a sports pool in Nevada.

24  Compl. ¶¶ 40–41. Accordingly, KALSHI has violated and continues to violate NRS 463.160.

25      KALSHI violates NRS 463.350. Pursuant to NRS 463.350, a person under the age of 21 may not

26  play, be allowed to play, place wagers at, or collect winnings from any game or sports pool. KALSHI's

27  market constitutes a percentage game and/or sports pool. Compl. ¶ 19–25. Yet KALSHI's market does

28  not restrict persons under the age of 21 from participating. *Id.* ¶ 34. Accordingly, KALSHI has violated

1  and continues to violate NRS 463.350.

2  KALSHI violates NRS 465.086. Pursuant to NRS 465.086(1), it is unlawful for any person to

3  directly or indirectly receive any compensation or any percentage or share of the money played for ac-

4  cepting or facilitating any wager upon the result of any sporting event without a gaming license. KALSHI

5  is not licensed to accept wagers in Nevada. Compl. ¶ 48. KALSHI's market accepts wagers in Nevada.

6  *Id.* ¶ 49. In addition to accepting wagers on the results of sporting events and other events, KALSHI's

7  market facilitates wagers on sporting events and other events between individual participants in its mar-

8  ket. *Id.* ¶ 50. KALSHI takes a percentage of money wagered through its market in the form of commis-

9  sions styled as "trading fees." KALSHI, *Kalshi Fee Schedule*, perma.cc/BZ3L-MYM5. Accordingly,

10  KALSHI has violated and continues to violate NRS 465.086.

11  KALSHI violates NRS 465.092. Pursuant to NRS 465.092, it is unlawful for a person to know-

12  ingly accept a wager from a person inside of Nevada through a medium of communication unless the

13  person accepting the wager is licensed pursuant to Nevada law and complies with applicable Nevada

14  laws and regulations concerning wagering. KALSHI's market accepts wagers on sporting events and

15  other events. Compl. ¶ 55. KALSHI's market accepts wagers from persons inside of Nevada. *Id.* ¶ 56.

16  The Internet is a medium of communication. NRS 465.091. KALSHI's market uses the Internet for wa-

17  gering activities. Compl. ¶ 58. Accordingly, KALSHI has violated and continues to violate NRS 465.092.

18  For at least these reasons, KALSHI is violating Nevada gaming law.

19  **B.    Plaintiff Is Suffering and Will Continue to Suffer Immediate and Irreparable Harm**
20  **Absent Relief.**

21  Both judges of this Court have determined that Plaintiff suffers immediate and irreparable harm

22  when an unlicensed entity allows persons within Nevada to wager on sports and other events through

23  event-based contracts in violation of Nevada law. Polymarket Op. 6–7; Coinbase Op. 5–6. As Judge

24  Woodbury explained, "every day" matters "in a literal sense" in these cases: "A day means more con-

25  sumers. More consumers mean more transactions. More transactions mean more potential harm." Poly-

26  market Op. 7. The federal court has come to the same conclusion with respect to KALSHI's unlicensed

27  operations, concluding that every day KALSHI operates in violation of Nevada law imposes "substantial

28  irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public

1  interest." *KalshiEX*, 2025 WL 3286282, at *13.

2       Those conclusions are correct. Plaintiff suffers serious and irreparable harm every day that

3  KALSHI operates its market in violation of Nevada law. The Nevada Legislature has enacted a "com-

4  prehensive regulatory structure, coupled with strict licensing standards" to ensure the integrity of gaming

5  in the State. NRS 463.745. Plaintiff is statutorily charged with enforcing Nevada gaming law and over-

6  seeing Nevada's gaming industry, to protect the reputation of the State of Nevada, to protect the reputa-

7  tion of gaming in Nevada, and to protect the public health, safety, morals, good order, and general welfare

8  of the inhabitants of Nevada. NRS 463.140(1).

9       KALSHI's failure to comply with Nevada gaming law impairs the BOARD from carrying out its

10  statutory functions. The BOARD has the obligation to "consistently and equitably" enforce Nevada gam-

11  ing law to "protect the health, safety, morals, good order, and general welfare of gaming consumers."

12  Polymarket Op. 6; *see* Coinbase Op. 5. KALSHI, as "[a]n unlicensed participant beyond the BOARD's

13  control," obstructs the BOARD's ability to fulfill its statutory duties. Polymarket Op. 6. The resulting

14  unlicensed and unregulated gambling means underage people can gamble, allows unsuitable persons to

15  run gaming operations, and distorts the gaming industry. *Id*. These harms "cannot be mitigated" once

16  incurred. *Id*.

17       KALSHI's operations threaten the integrity of gaming. For example, to ensure that wagering is

18  fair, Nevada gaming regulations prohibit accepting wagers on sporting events from owners, coaches,

19  players, officials, or other participants in the event and require licensees to take reasonable steps to avoid

20  circumvention of this regulation. Nev. Gam'g Comm. Reg. 22.1205(2). Licensed sports books also must:

21  (1) obtain certain identification information from patrons who place wagers of a certain size; (2) prevent

22  multiple wagers designed to circumvent the identification requirements for wagers of a certain size; and

23  (3) prevent wagers structured to circumvent the identification requirements. Nev. Gam'g Comm. Reg.

24  22.061, 22.062, and 22.063. Further, licensed sports books must communicate with the BOARD about

25  potential evidence of match fixing or point shaving. *See id.* at 22.121. To Plaintiff's knowledge, KALSHI

26  does not adhere to these requirements, which harms the BOARD by preventing it from ensuring the

27  integrity of gaming in the State. To the contrary, its own chief executive officer recently said that insider

28  trading on its platform is "fair game" and simply "part of the risk in the market." Compl. ¶ 36.

1    KALSHI's failure to comply with Nevada gaming law gives it a massive and unfair competitive
2    advantage over its competitors, which greatly disrupts the gaming industry. That advantage is both pecu-
3    niary, in that KALSHI does not need to spend the money its competitors need to spend on licensing fees,
4    taxes, and compliance (including maintaining a physical location in Nevada), as well as strategic, in that
5    KALSHI's products are not subject to the same requirements as its competitors. The BOARD suffers
6    irreparable harm when KALSHI is able to distort the playing field and disrupt the industry in this manner.
7    *KalshiEX*, 2025 WL 3286282, at *13–14; *see Hotel Emps. & Rest. Emps. Int'l Union v. Nev. Gaming*
8    *Comm'n*, 984 F.2d 1507, 1509 (9th Cir. 1993). The harm only increases the longer KALSHI is allowed
9    to operate unfettered. KALSHI's ability to profit from unlicensed gaming will incentivize others to enter
10   into prediction markets instead of becoming (or remaining) licensed by the State. Indeed, that already has
11   started to happen: DraftKings and FanDuel have decided to forgo licensing in Nevada so that they can
12   enter the prediction-markets business in other States. *See KalshiEX*, 2025 WL 3286282, at *14. Other
13   sportsbooks could follow suit, "unleashing even more unregulated gambling." *Id.*
14          Thus, the harms caused by KALSHI are ongoing, serious, and irreparable. Now that the BOARD
15   is no longer prohibited from enforcing its statutory charge to strictly regulate gaming, it seeks to stop the
16   myriad of harms caused by KALSHI. KALSHI has made clear that it will not stop its violations of Nevada
17   law unless and until restrained by this Court: It told the federal district court that the only thing that "could
18   affect Kalshi's ongoing operations in the State" is if the BOARD takes "enforcement measures" against
19   it. Reply in Further Supp. of Mot. to Stay Proceedings 9, *KalshiEX*, *supra* (ECF No. 262). That confirms
20   that an order from this Court is required to stop KALSHI from continuing to harm the State.

21          **C.    The Balance of Hardships and the Public Interest Weigh Heavily in Favor of Grant-
22                  ing an *Ex Parte* Temporary Restraining Order and a Preliminary Injunction.**

23          Compared to the ongoing, severe, irreparable harm that KALSHI's market causes to the BOARD
24   and to the State, any harms that KALSHI claims to suffer from an injunction are insignificant. Indeed,
25   the BOARD seeks only for KALSHI to follow Nevada gaming law, and following the law is not a harm.
26   *See Goldman v. Newage Lake Las Vegas, LLC*, 2019 WL 13254890, at *1 (D. Nev. Oct. 23, 2019).
27          KALSHI has argued that federal law preempts Nevada gaming law, and that it is harmed by being
28   required to follow preempted law. But the federal court concluded that KALSHI is unlikely to prevail on

026

1    this argument. *KalshiEX*, 2025 WL 3286282, at \*6–12. Two judges of this Court also have concluded

2    that federal law likely does not preempt state gaming law. Polymarket Op. 5-6; Coinbase Op. 4-5.

3          In any event, as the federal court explained, KALSHI does not face irreparable harm. All other

4    sportsbooks comply with state law, either by becoming licensed or by geofencing their operations to

5    avoid Nevada, and KALSHI can do that too. *KalshiEX*, 2025 WL 3286282, at \*12. KALSHI just wants

6    to make more money; all of its harms are self-inflicted and therefore are not irreparable. *Id.* at \*13.

7    KALSHI started offering sports contracts despite an express federal prohibition on those contracts. *See*

8    17 C.F.R. § 40.11(a). Then it chose to forge ahead with an untested preemption theory, even though the

9    district court warned KALSHI that it was "proceeding at its own risk and creating its own harms."

10   *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at \*8 (D. Nev. Apr. 9, 2025), *order dissolved*, 2025 WL

11   3286282 (D. Nev. Nov. 24, 2025). Even after the district court ruled against KALSHI, KALSHI dramat-

12   ically expanded its operations, including by launching new series of sports wagers, entering into addi-

13   tional partnerships, and aggressively marketing its platform, leading to record downloads and betting

14   volumes. *See supra* pp. 4–5. Any claimed harms from being required to stop operating are "largely mon-

15   etary"—"essentially that [the company] will not be able to profit from [its] trades"—and pale in compar-

16   ison to the harms to the BOARD. *KalshiEX*, 2025 WL 3286282, at \*12. The balance of harms thus weighs

17   heavily in the BOARD's favor. *Id.* at \*13; *see* Polymarket Op. 7; Coinbase Op. 7.

18         The public interest similarly weighs in favor of enjoining KALSHI from violating Nevada gaming

19   law. The Legislature has determined that "[p]ublic confidence and trust can only be maintained by strict

20   regulation of all persons, locations, practices, associations and activities related to the operation of li-

21   censed gaming establishments." NRS 463.0129(1)(c). "All establishments where gaming is con-

22   ducted . . . must therefore be licensed, controlled and assisted to protect the public health, safety, morals,

23   good order and general welfare of the inhabitants of the State[.]" NRS 463.0129(1)(d). The Legislature

24   thus has determined that the public interest requires *all* gaming operators to be licensed and to follow

25   Nevada gaming law. Any gaming business, including KALSHI, that does not comply with Nevada gam-

26   ing law poses a threat to this vital industry. *See* Polymarket Op. 6; Coinbase Op. 5.

27         In particular, KALSHI does not adhere to the consumer-protection requirements in Nevada law.

28   To start, KALSHI's operations harm some of Nevada's most vulnerable residents. Nevada law prohibits

persons under 21 from placing sports wagers, NRS 463.350(1)(a), but KALSHI does not require its participants to be 21 years of age. Nevada law also protects those suffering from problem gaming by requiring, among other measures, that gaming licensees letting patrons set deposit limits, "conspicuously display" information about responsible-gaming resources, train employees to identify signs of problem gaming, and refrain from marketing to customers who have excluded themselves. Nev. Gam'g Comm. Reg. 5.225(18)(a)–(b). To Plaintiff's knowledge, KALSHI does not adhere to these requirements to the extent required by Nevada law. Instead, KALSHI gleefully describes its platform as "kind of addicting." Dustin Goucher, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025), perma.cc/5DWW-4LKE. And KALSHI's counsel has disclaimed a desire for any consumer-protection limits: "People are adults," and "they're allowed to spend their money however they want it, and if they lose their shirt, that's on them." Danny Funt, *America's Betting Craze Has Spread to Its News Networks*, New Yorker (Dec. 12, 2025), perma.cc/77H2-RH96.

KALSHI's operations further harm the gaming public because KALSHI does not participate in the State's process to resolve patron disputes. *See* NRS 463.362 *et seq.* Patrons of licensed gaming establishments may utilize a process with the BOARD to resolve disputes related to wagering activities. But this structure is in place only for disputes between a Nevada licensee and its patron. NRS 463.362. A person entering a wager through an event contract available on KALSHI's market is not a patron of a Nevada licensee and, thus, pursuant to the applicable statutes, has no recourse should there be a dispute over the wager. KALSHI's market thus harms the public interest because it does not provide adequate protection to purchasers of event contracts.

KALSHI also harms the State's economy and the public fisc. Licensed gaming is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS 463.0129(1)(a). All licensed gaming operators must pay taxes, *see* NRS 463.370—revenues that finance "indispensable" State functions, from schools to highways, *Sacco v. State*, 105 Nev. 844, 847, 784 P.2d 947, 949 (1989). Indeed, the gaming industry contributes over $2 billion in taxes, representing over one-third of Nevada's general fund. Nev. Resort Ass'n, *2025 Nevada Gaming Fact Book* 2 (2025), perma.cc/NRH9-5NGV. KALSHI's unlicensed gaming operations threatens that revenue, by evading taxes and diverting business from licensed sports books that pay taxes, and thus "represents a serious threat to the state's economic

1  base." *Sacco*, 105 Nev. at 847. As the federal district court explained, allowing KALSHI to continue its

2  unlawful gaming activities risks "devastating the Nevada economy and related tax revenues." *KalshiEX*,

3  2025 WL 3286282, at *14. The public interest thus weighs decisively in favor of enjoining KALSHI. *See*

4  Polymarket Op. 7; Coinbase Op. 7.

5      **D.      No Security Is Required.**

6      NRCP 65(b)(2)(c) generally requires that a party in whose favor a temporary restraining order is

7  issued post security "in an amount that the court considers proper to pay the costs and damages sustained

8  by any party found to have been wrongfully enjoined or restrained." However, that same provision re-

9  quires unequivocally that "[t]he State, its officers, and its agencies are not required to give security."

10  Therefore, the *ex parte* temporary restraining order can and should be issued and effective without the

11  posting of security.

12  **V.      CONCLUSION**

13      The Court should grant this application for *ex parte* temporary restraining order and preliminary

14  injunction, and immediately enter an order prohibiting KALSHI and any of its agents, employees, offic-

15  ers, or affiliates from operating a market that offers event-based contracts relating to sporting and other

16  events to people in Nevada without obtaining all required Nevada gaming licenses, and prohibiting

17  KALSHI from allowing its market to accept wagers from persons under the age of 21 in Nevada.

18

19

20

21

22

23

24

25

26  / / /

27  / / /

28  / / /

029

**AFFIRMATION**
**(Pursuant to NRS 239B.030)**

The undersigned does hereby affirm that the foregoing document does not contain the social security number of any person.

Dated: February 17, 2026

AARON D. FORD
Attorney General

By:

Jessica E. Whelan (Bar No. 14781)
Chief Deputy Solicitor General—Litigation
State of Nevada
Office of the Attorney General
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for Plaintiff*