AARON D. FORD
  Attorney General
Jessica E. Whelan (Bar No. 14781)
  Chief Deputy Solicitor General – Litigation
Sabrena K. Clinton (Bar No. 6499)
  Senior Deputy Attorney General
John S. Michela (Bar No. 8189)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
sclinton@ag.nv.gov
jmichela@ag.nv.gov

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STATE OF NEVADA ex rel. NEVADA GAMING CONTROL BOARD,<br><br>          Plaintiff,<br><br>vs.<br><br>KALSHIEX, LLC<br><br>          Defendant, | Case No. 2:26-cv-00406-APG-MDC<br><br><br>**PLAINTIFF'S EMERGENCY MOTION TO REMAND** |

Plaintiff the State of Nevada on relation of the Nevada Gaming Control Board (the Board) respectfully asks the Court to remand this case to state court.

Pursuant to LR 7-4, the Board seeks to have this motion heard on an emergency basis. The Board brought this civil enforcement action under Nevada gaming law to enjoin Defendant KalshiEX LLC (Kalshi) from offering unlicensed sports betting in Nevada. As three courts have found, every day that Kalshi offers gambling in violation of Nevada law causes "substantial irreparable harms to the Board, the State of Nevada, the gaming industry in this state, and the public interest." *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *13 (D. Nev. Nov. 24, 2025); *see* Order at 6–7, *Nevada v. Blockratize, Inc.*, No. 26-OC-00012-1B (Nev. 1st Jud. Dist. Jan. 29, 2026) (Polymarket TRO); Order at 6–7,

*Nevada v. Coinbase Fin. Mkts., Inc.*, No. 26-OC-00030-1B (Nev. 1st Jud. Dist. Feb. 5, 2026) (Coinbase TRO). Within minutes of when the Board filed this state enforcement action, Kalshi removed it, apparently so that it can continue profiting from its violation of Nevada's gaming laws for as long as possible.

Kalshi's asserted grounds for removal lack merit. And it is clear that this case belongs in state court: Nevada law specifically provides that actions to enforce state gaming law should be filed in state court, and the State has a strong sovereign interest in enforcing its laws in its own courts. This Court should immediately remand the case so that the state court with jurisdiction over this civil enforcement action can put a stop to Kalshi's illegal gambling operations in Nevada.

To allow the Court to rule as quickly as possible, the Board proposes that Kalshi file its response brief by February 20, 2026, and that the Board file its reply brief by February 23, 2026. Pursuant to LR 7-4(a), a declaration of Jessica E. Whelan, counsel for the Board, is attached.

This motion is based on the following memorandum of points and authorities, the referenced pleadings and exhibits, and any oral argument the Court may entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Kalshi offers "sports wagers and everyone who sees them knows it"—including Kalshi, which advertises itself as the "'first app for legal sports betting in all 50 states.'" *Hendrick*, 2025 WL 3286282, at *8 (quoting Kalshi's advertisement). Yet Kalshi does not possess a license to offer sports betting in Nevada or in any State. Instead, it argues that because it offers its sports bets on a market registered with the Commodity Futures Trading Commission (CFTC), only the CFTC can regulate its sports bets.

On this basis, Kalshi sued the Board in federal court to enjoin the Board from enforcing Nevada gaming law against it. But this Court found that Kalshi is not likely to succeed on the merits and declined to preliminarily enjoin the Board from starting an enforcement action while Kalshi's lawsuit is pending. Kalshi has appealed that decision.

In the meantime, no court order prevents the Board from enforcing state gaming laws against Kalshi. So, after providing notice to the Ninth Circuit, the Board filed this civil enforcement action in state court. The Board seeks to enjoin Kalshi's unlawful gambling operations in Nevada until Kalshi obtains a Nevada gaming license and complies with Nevada's gaming laws (or stops operating in the State).

Within hours, Kalshi removed the case to federal court. Kalshi asserts that this action about violations of Nevada law can only be heard in federal court. Its arguments lack merit—and indeed its core argument already has been rejected by the federal district court in Massachusetts, when Kalshi tried the same removal gambit after Massachusetts filed a civil enforcement action against it in state court.

Kalshi's first basis for removal—that the Board's state law claims purportedly "arise under" federal law—fails under longstanding precedent. Kalshi seeks to raise a federal preemption *defense*, and it is well established that a federal defense does not provide a basis for removal. If Kalshi were correct, then state courts would never be able to adjudicate federal defenses. Yet it is black-letter law that state courts are competent to—and are expected to—decide questions of federal law. And in fact, state courts have a special sovereign interest in enforcing their own state laws.

Kalshi's second basis for removal is its claim that the Commodity Exchange Act (CEA), 7 U.S.C. § 1 *et seq.*, completely preempts state law. Complete preemption is a doctrine that applies exceedingly rarely, where a statute's preemptive force is "so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Metro. Life Ins. v. Taylor*, 481 U.S. 58, 65 (1987)). The Supreme Court has identified only three statutes that are completely preemptive in this way, and the CEA is not one of them. Nothing in the CEA shows that Congress had the intent to completely displace state causes of action, much less in an area of core state police power like the regulation of gambling. Not surprisingly, the only courts

/ / /

that have considered the question have concluded that the CEA is *not* completely preemptive.

Kalshi's third basis for removal is premised on its view that the Board was required to name the CFTC as a defendant in its state-law complaint. That is wrong. The Board is not arguing that the CFTC has violated Nevada gaming law. Rather, the Board is seeking to enforce state gaming law against Kalshi, and deciding the claims against Kalshi will not affect any right, duty, or obligation of the CFTC. The CFTC has no "legal interest" in the outcome of the state-court case and thus did not need to be named as a defendant. *Wells v. Bank of Nevada*, 90 Nev. 192, 198 (1974).

This Court should remand this case as soon as possible. Further, given the lack of any objectively reasonable basis for removal, the Court also should award the Board its attorneys' fees and costs.

## II.    BACKGROUND

### A.    Nevada Law Comprehensively Regulates Gaming

Nevada's gaming industry is "vitally important to the economy of the State and the general welfare of the inhabitants." NRS § 463.0129(1)(a). All entities that conduct gaming in Nevada must "be licensed, controlled and assisted to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." *Id.* § 463.0129(1)(d).

The Nevada Legislature has found that the continued growth and success of gaming "is dependent upon public confidence and trust that licensed gaming" is "conducted honestly and competitively." NRS § 463.0129(1)(b). Further, the Legislature has made clear the judgment that "public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related" to the operation of gaming in Nevada. *Id.* § 463.0129(1)(c). The Board is statutorily charged with administering and enforcing Nevada gaming law and must do so evenhandedly. *Id.* §§ 463.140(1), 463.0129(1)(c).

"Gaming" in Nevada is synonymous with "gambling" and includes any regulated game. NRS § 463.0153. A "gambling game" subject to regulation in Nevada includes "any

game played with . . . equipment or any . . . electronic device or machine for money . . . or any representative of value" that is accessible in Nevada. *Id.* § 463.0152. The games subject to regulation in Nevada include "percentage game[s]," *id.*, which exist when the "house" does not directly participate in a wager and its only stake is a commission derived from the wager, *see Hughes Props., Inc. v. State*, 100 Nev. 295, 297 (1984). Gaming also includes operating a "sports pool," which is "the business of accepting wagers on sporting events or other events by any system or method of wagering," NRS § 463.0193; a "wager" is a "sum of money or representative of value that is risked on an occurrence for which the outcome is uncertain," *id.* § 463.01962.

Nevada law comprehensively regulates entities that conduct gaming activities in the State. Each entity that makes gaming activities accessible in Nevada is subject to a rigorous licensing process. NRS § 463.160(1). Entities conducting gaming activities in Nevada must pay taxes on gross gaming revenue derived from gaming activities accessible in the State. *Id.* § 463.373. Licensed entities accepting wagers from persons in the State must have a physical location in Nevada. Nev. Gaming Reg. 22.060(2). Licensed entities may not accept wagers from those under 21 years of age. NRS § 463.350. Further, licensed entities accepting wagers on sporting events must employ safeguards to ensure that wagers are not being placed on an event by owners, coaches, players, or officials participating in the event, and must communicate with Nevada gaming regulatory authorities about potential evidence of match fixing or point shaving. *See* Nev. Gaming Regs. 22.1205(2), 22.121.

To stop the unlawful operation of a gaming entity in Nevada, the Board is authorized to bring a civil action in state court. NRS § 463.343. Such an action must be brought in the district court for Carson City, Nevada, or the place where the company does business. *Id.* The Board may ask the state court to enter a declaratory judgment or injunction to enforce state gaming law. *Id.* §§ 463.343, 463.346.

/ / /

/ / /

### B.    The CFTC Regulates Commodities Trading

The CFTC regulates trading in commodity derivatives—financial instruments that companies use to manage risk. It is not a gaming regulator.

In 1936, Congress enacted the CEA to regulate trading in futures in wheat, corn, and other agricultural commodities. Pub. L. No. 74–675, § 3, 40 Stat. 1491, 1491 (1936). A "future" is a contract to buy or sell a quantity of a commodity at a specified price on a future date. *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995). Businesses use futures to hedge against price volatility. *Id.* The CEA initially authorized the Secretary of Agriculture to register "designated contract markets" (DCMs) for futures trading. 7 U.S.C. § 7 (1936).

In 1974, Congress expanded the CEA to cover additional commodities, including non-agricultural commodities. Pub. L. No. 93–463, § 201(b), 88 Stat. 1389 (1974). A "derivative" is a contract whose value depends on the performance of an underlying asset, such as a commodity. *Black's Law Dictionary* (12th ed. 2024). An "option" is a contract that "grants to the purchaser the right, for a specified period of time, to either buy or sell the subject of the option at a predetermined price." *CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1226 (9th Cir. 2009) (internal quotation marks omitted).

Also in 1974, Congress created the CFTC "to consolidate federal regulation of commodity futures trading" in one agency. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). To that end, Congress gave the CFTC "exclusive jurisdiction" over futures and options that are traded on DCMs or other markets. *Id.*; *see* 7 U.S.C. § 2(a) (1974).

In 2010, Congress enacted the Dodd-Frank Act, which expanded the CEA to cover "swaps." Pub. L. No. 111–203, pt. II, 124 Stat. 1376, 1658–754 (2010). A "swap" is an agreement between two parties to exchange (or swap) cash flows on financial obligations (such as interest payments), to hedge risk on those obligations. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042–43 (9th Cir. 2003). Congress added "swaps" to the CEA because certain swaps, known as "credit default swaps," had exacerbated the

financial crisis. Cong. Rsch. Serv., R41350, *The Dodd-Frank Wall Street Reform and Consumer Protection Act* 3 (2017).

Thus, after the Dodd-Frank Act, the CFTC has "exclusive jurisdiction" over commodity derivatives, including "swaps," "'option[s]'" and "contracts of sale of a commodity for future delivery" (*i.e.,* futures) that are "traded or executed on a [designated] contract market" or "any other board of trade, exchange, or market." 7 U.S.C. § 2(a)(1)(A). The mere fact that a contract is traded on a DCM does not make it subject to the CFTC's "exclusive jurisdiction"; it also must qualify as one of the listed types of commodity derivatives (such as a swap, option, or future). *Id.* Further, if a consumer contract qualifies as a swap, option, or future, it can be traded *only* on a CFTC-registered DCM. *See id.* § 2(e) (swaps); *id.* § 6(a) (futures); 17 C.F.R. § 33.3(a) (options). It cannot be traded anywhere else.

To offer a contract for trading, a DCM can self-certify that the contract complies with the CEA and immediately start trading, without any action by the CFTC. 7 U.S.C. § 7a-2(c)(1)–(2). In its self-certification, the DCM must identify whether the contract is a swap, option, or future. *See* 17 C.F.R. § 38.4(b). The CFTC can review a self-certification and disallow a contract that fails to comply with the CEA's requirements. 7 U.S.C. § 7a-2(c)(3).

Further, under the "Special Rule," the CFTC may disallow a contract that involves "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," or "gaming." 7 U.S.C. § 7a-2(c)(5). Exercising its authority under the Special Rule, the CFTC categorically prohibited contracts "that involve[], relate[] to, or reference[]" "gaming." 17 C.F.R. § 40.11(a).

## C.    Kalshi Offers Unlicensed Gambling

Kalshi operates a CFTC-registered DCM that allows users in Nevada to wager on the outcome of sports, elections, and other events. *See* ECF No. 8-1 (Compl.) ¶¶ 2, 20. Ninety-five percent of Kalshi's revenues are from sports contracts. Sam Learner, *Prediction Markets Barely Make Money; Sportsbooks Make Money*, Fin. Times (Dec. 19, 2025), perma.cc/CB9N-SN6P.

/ / /

As this Court explained, Kalshi's products "are sports wagers and everyone who sees them knows it." *Hendrick*, 2025 WL 3286282, at *8. For example, as of February 16, 2026, a user could buy a contract for $0.17 that would pay out $1 if the University of Michigan wins the 2026 NCAA Division I men's college basketball championship. Compl. ¶ 21. Kalshi offers the full range of sports bets, including bets on the winners and losers of games, "prop" bets on outcomes within a game (such as the total number of points scored), and "parlays" (chained bets on two or more outcomes). Marc Novicoff, *The Company Making a Mockery of State Gambling Bans*, Atlantic (Oct. 26, 2025), perma.cc/8TAG-NJSJ. Kalshi's offerings thus are indistinguishable from those of traditional sportsbooks. Indeed, Kalshi advertises its products as "legal sports betting in all 50 states":



Compl. ¶ 22.

Kalshi's business has exploded since it first started offering sports bets in January 2025. Kalshi's 30-day volume has hit over $10 billion in wagers. Dustin Gouker, *The Handle: Inside Kalshi's First $10 Billion Month*, The Closing Line (Feb. 10, 2026), perma.cc/E4G5-6XLZ. It reported over $1 billion in wagers on Super Bowl Sunday alone—over 27 times more than it reported for the Super Bowl in 2025. Anna Betts, *Prediction Market Kalshi Reached $1bn in Trading Volume During Super Bowl*, Guardian (Feb. 10,

2026), perma.cc/KDU4-ER7R. Over $100 million was wagered on one question—what song would be performed first at the halftime show. *Id.* In contrast, betting volumes on the Super Bowl at Nevada's regulated sportsbooks declined nearly 15% from 2025, hitting a ten-year low. Sam McQuillan, *Super Bowl Betting Results Mask Game's Real Financial Story*, Legal Sports Report (Feb. 10, 2026), perma.cc/83KN-RQHC.

### D. The Board Seeks To Stop Kalshi's Unlicensed Gambling

Kalshi's sports, elections, and other event contracts are "wagers" under Nevada law because they allow a person located in Nevada to risk a "sum of money" on "an occurrence for which the outcome is uncertain." NRS § 463.01962. Kalshi thus is operating a "sports pool" under Nevada law, because it is in the business of accepting wagers on sporting events or other events. *Id.* § 463.0193; *see* Compl. ¶¶ 19–21, 37–42. And because Kalshi takes a commission from the wagers placed, *see* Compl. ¶ 24, it also runs "percentage games." NRS § 463.0152; *Hughes*, 100 Nev. at 297; *see* Compl. ¶¶ 23–24, 45. Operating sports pools or percentage games in Nevada requires a gaming license. NRS §§ 463.0152(1), 463.160(1). But Kalshi is not licensed to operate either a sports pool or a percentage game in Nevada and does not otherwise comply with Nevada gaming law. Compl. ¶ 26.

In March 2025, the Board sent Kalshi a cease-and-desist letter, directing it to stop accepting wagers from persons inside Nevada without a gaming license. Compl. ¶ 61. In response, Kalshi filed a lawsuit in this Court, arguing that because it registered its DCM with the CFTC, the CFTC has "exclusive jurisdiction" over any product Kalshi has listed, or ever will list, for trading on its DCM. Compl. ¶¶ 64–70, *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575 (D. Nev. Mar. 8, 2025) (ECF No. 1) (*KalshiEX* Compl.).

After initially granting Kalshi a preliminary injunction on an expedited basis, this Court dissolved that injunction, finding that Kalshi is not likely to succeed on the merits of its preemption argument and that the balance of equities does not tip in Kalshi's favor. *Hendrick*, 2025 WL 3286282, at *1, *14. This Court held that Kalshi's preemption argument fails at the outset because its contracts are not commodity derivatives (swaps, options, or futures) and so they are not within the "exclusive jurisdiction" of the CFTC. *Id.*

at *6–12. The Court explained that Kalshi's definition of "swaps" "has no limiting principle" and would lead to the "absurd" result that "all sports betting across the country [would] come within the jurisdiction of the CFTC rather than the states and Indian tribes," which would "upset[] decades of federalism regarding gaming regulation." *Id.* at *1, *9.

This Court then determined that "the balance of hardships tips in favor of the Board, and the public interest favors dissolving the injunction." *Hendrick*, 2025 WL 3286282, at *3. Kalshi's claimed harms "are largely monetary" ("essentially that it will not be able to profit from [its] trades"), and Kalshi "created or amplified" those harms by "greatly expand[ing]" its business instead of "proceed[ing] cautiously until this and other lawsuits played out." *Id.* at *12–13. The Board, in contrast, faces "substantial" and "irreparable" harms that "weigh heavily" against Kalshi's asserted harms. *Id.* at *13–14. Kalshi's continued operation deprives Nevada of needed revenue, gives Kalshi an unfair advantage over its licensed competitors, and harms the public. *Id.*

Kalshi appealed the preliminary-injunction decision to the Ninth Circuit. *See KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. filed Nov. 25, 2025). Kalshi then moved for an injunction pending appeal, which this Court denied. *KalshiEX, LLC v. Hendrick*, 2025 WL 3642346, at *1 (D. Nev. Dec. 16, 2025).

Kalshi then requested an injunction pending appeal from the Ninth Circuit. *See* Motion, 9th Cir. No. 25-7516 (ECF No. 17.1). In order to give the Ninth Circuit time to rule on Kalshi's motion, the Board agreed not to bring a state enforcement proceeding against Kalshi while the motion was pending. *Id.* at 17. The parties briefed the motion on an expedited basis, so that it was fully briefed by January 5, 2026. *See* Reply, 9th Cir. No. 25-7516 (ECF No. 28.1). The Ninth Circuit did not rule on the motion, but instead referred the motion to the merits panel, *see* Order, 9th Cir. No. 25-7516 (ECF No. 42.1), and scheduled oral argument for April 16, 2026, *see* Notice of Oral Arg., 9th Cir. No. 25-7516 (ECF No. 58).

On February 10, 2026, the Board notified the Ninth Circuit of its intent to bring a civil enforcement proceeding against Kalshi on February 17, 2026. *See* Notice, 9th Cir. No.

25-7516 (ECF No. 60.1). The Board explained that it had already required Kalshi's competitors and partners—Crypto.com, Robinhood, Polymarket, and Coinbase—to cease operating in Nevada without a gaming license, whether by court order or agreement. *Id.* at 2. The Board further explained that, in the time since this Court's denial of Kalshi's motion for an injunction pending appeal, Kalshi had significantly expanded its operations, thereby exacerbating the irreparable harm it is causing to the State, its gaming industry, and the public. *Id.* at 1–2. In response, Kalshi filed an emergency motion for an administrative stay, seeking to prohibit the Board from initiating a civil enforcement proceeding against it. *See* Mot., 9th Cir. No. 25-7516 (ECF No. 62.1). On February 17, 2026, the Ninth Circuit denied Kalshi's request for an administrative stay. *See* Order, 9th Cir. No. 25-7516 (ECF No. 69.1).

That same day, the Board initiated civil enforcement proceedings against Kalshi by filing this action in state court. The Board brought suit under NRS §§ 30.030, 463.343, and 463.346, seeking a declaration that Kalshi is violating Nevada gaming laws, including NRS §§ 463.160, 463.350, 465.086, and 465.092, and injunctive relief to halt those violations. *See* Compl. ¶¶ 62–82. The Board filed the action in the district court for Carson City, consistent with NRS § 463.343, which requires the Board to file "in the district court in and for Carson City or the district court in and for the county which the plaintiff resides or does business." NRS § 463.343(1). The Board moved for a temporary restraining order and a preliminary injunction, explaining that Kalshi's unlicensed operations cause severe and irreparable harm to the State, its gaming industry, and the public, and that Kalshi has been given ample notice of its obligation to comply with Nevada law (or cease offering its unlawful event contracts in the State). *See* ECF No. 8-2, at 7–13.

Within minutes of receiving a courtesy of the state court filings, Kalshi filed a notice of removal, asserting that the Board's state-law enforcement action must be heard by this Court. *See* ECF No. 1 (Notice).

## III.   LEGAL STANDARD

It is black-letter law that state courts have both the power and the duty to address federal issues that arise in state court. *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473,

477–78 (1981). It also is black-letter law that the mere presence of a possible federal defense to a state law enforcement action does not make a case removable to federal court. *Caterpillar*, 482 U.S. at 393.

A defendant can remove to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"—in other words, federal-question jurisdiction. *Id.* § 1331. Whether a district court has federal-question jurisdiction is determined under the "well-pleaded complaint rule" in which only "the face of the plaintiff's properly pleaded complaint" is considered. *Caterpillar*, 482 U.S. at 392. Under the well-pleaded complaint rule, a cause of action "arises under" federal law "only if federal law 'creates the cause of action' or a 'substantial question of federal law is a necessary element' of a plaintiff's well-pleaded complaint"—meaning that there is no way to decide the cause of action without deciding a question of federal law. *Newtok Vill. v. Patrick*, 21 F.4th 608, 616 (9th Cir. 2021) (citation omitted).

One exception to the well-pleaded complaint rule is the complete preemption doctrine, which applies only if Congress intended to "completely pre-empt a particular area [such] that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life*, 481 U.S. at 63–64. Complete preemption, however, "is a misnomer, having nothing to do with preemption." *Vegas Fab & Finish v. AMG Freight LLC*, 2024 WL 166759, at *4 (D. Nev. Jan. 16, 2024). Instead, complete preemption is "a jurisdictional . . . doctrine" that exists when a "federal statutory scheme is so comprehensive that it entirely supplants state law causes of action." *Saldana v. Glenhaven Healthcare LLC*, 27 F.4th 679, 686 (9th Cir. 2022) (internal quotation marks omitted). In that situation, "Congress clearly manifested an intent to convert state law claims into federal-question claims" such that "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Wayne v. DHL Worldwide Express*, 294 F.3d 1179, 1183–84 (9th Cir. 2002).

If a "case is improperly removed," then "the federal court must remand the action because it has no subject-matter jurisdiction to decide the case." *Arco Env't Remediation, L.L.C. v. Dept' of Health & Env't Quality of Mont.*, 213 F.3d 1108, 1113 (9th Cir. 2000).

## IV.    ARGUMENT

Kalshi asserts three theories of removal. Each lacks merit. First, Kalshi argues that there is federal-question jurisdiction under 28 U.S.C. § 1331 because adjudicating the Board's claims necessarily requires deciding a question of federal law. But federal law appears *nowhere* on the face of the complaint; the only federal question here is Kalshi's preemption defense. Binding precedent establishes that a federal defense does not create federal-question jurisdiction.

Second, Kalshi argues that the Board's claims are subject to complete preemption. But no court has ever held that the CEA effects "complete preemption" of state law, and this Court should not be the first. No provision of the CEA shows a congressional intent to take away all state causes of action (to the contrary, the CEA has a savings clause for state-court jurisdiction), and the CEA does not provide a cause of action that addresses the same unlawful conduct that the Board seeks to address—so the two key prerequisites for complete preemption are missing here.

Third, Kalshi argues that the CFTC is an essential defendant under Nevada law, and so (once the CFTC is joined) Kalshi can remove the case under the federal officer removal statute. But Nevada is not seeking to enforce the gaming laws against the CFTC; it is seeking to enforce them against Kalshi. The CFTC has no "legal interest" in the outcome of the state-court case and thus did not need to be named as a defendant. *Wells*, 90 Nev. at 198.

Finally, the Court should award attorneys' fees because none of Kalshi's asserted bases for removal is objectively reasonable.

/ / /

/ / /

/ / /

### A.    The Board's State-Law Claims Do Not Support Federal-Question Jurisdiction

Kalshi first argues that this case belongs in federal court because it "arises under" federal law. *See* Notice ¶¶ 15–22. Kalshi is wrong. The Board filed this action in Nevada state court, seeking to enforce state gaming law, and asserting only state-law causes of action. Compl. ¶¶ 62–82. There is no federal claim on the face of the well-pleaded complaint. That is the end of the jurisdictional inquiry. *See Caterpillar*, 482 U.S. at 392. If Kalshi believes federal law supplies a defense to those claims, it is free to raise that defense in state court. (Indeed, two of its competitors have raised the preemption defense in state court, and the state courts agreed with this Court. Polymarket TRO 5; Coinbase TRO 5.) Kalshi may not transform a state-law enforcement action into a federal case through removal.

Federal courts have jurisdiction to decide cases "arising under" federal law. 28 U.S.C. § 1331; *see Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025). "Arising under" jurisdiction is carefully circumscribed: A case "arises under" federal law only if either (1) federal law creates the cause of action, or (2) a "substantial question of federal law is a necessary element of a plaintiff's well-pleaded complaint." *Newtok*, 21 F.4th at 616 (citation omitted). Kalshi relies only on the second category. It argues that this is one of the "rare" class of cases in which a complaint asserting only state-law claims nonetheless "necessarily raise[s]" a "substantial" and "actually disputed" federal issue—that is, where it is not legally possible to decide the cause of action without addressing federal law. *Royal Canin*, 604 U.S. at 26; *see Gunn v. Minton*, 568 U.S. 251, 258 (2013) (referring to the second category as a "special and small category" of cases).

Kalshi is wrong, and its position (if accepted) would dramatically expand federal-question jurisdiction. Kalshi's main argument is that a court cannot decide whether Kalshi is violating Nevada law without also deciding whether state law is preempted by the federal CEA. Notice ¶¶ 13, 26. But that preemption issue was not raised by the Board in the complaint; instead, it is a preemption defense. Nevada's complaint pleaded only state law

causes of action: claims for declaratory and injunctive relief under NRS §§ 30.030, 463.343, and 463.346 to restrain violations of Nevada's gaming laws, including NRS §§ 463.160, 463.350, 465.086, and 465.092. Those claims can be decided without addressing federal law. Whether Kalshi's unlicensed operations violate Nevada law depends on what contracts it is offering, whether its sports bets qualify as "wagers" and whether it is operating a "sports pool" or "percentage game" under Nevada law, and whether it is licensed, pays Nevada taxes, and otherwise complies with Nevada gaming law. *See* Compl. ¶¶ 26–60.

Throughout this litigation, Kalshi has admitted that its federal law argument is a preemption defense. That is what it repeatedly told this Court and the Ninth Circuit on appeal. In its complaint to enjoin Nevada from enforcing Nevada gaming law, Kalshi described its federal-law argument as a preemption argument, *see KalshiEX* Compl. ¶ 1; its motion for a preliminary injunction, *see, e.g.*, Mot. 2, D. Nev. No. 25-cv-575 (ECF No. 18); its preliminary-injunction briefing, *see, e.g.*, Reply 2, D. Nev. No. 25-cv-575 (ECF No. 40); and its motion for an injunction pending appeal and the briefing on that motion, *see, e.g.*, Motion 10, D. Nev. No. 25-cv-575 (ECF No. 238); Reply 1, D. Nev. No. 25-cv-575 (ECF No. 256), all do the same. In the court of appeals, Kalshi again described its argument about CFTC jurisdiction as a "preemption" argument in its opening brief and reply brief, *see, e.g.*, Opening Br. 1, 2, 4, 26–40, 9th Cir. No. 25-7516 (ECF No. 20.1); Reply Br. 2–3, 21–33, 9th Cir. No. 25-7516 (ECF No. 67.1), and in its briefing where it sought to enjoin state enforcement pending appeal, *see, e.g.*, Mot. 1, 10–11, 9th Cir. No. 25-7516 (ECF No. 17.1); *see also KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 678 (D. Md. 2025) ("Kalshi argues that Congress manifested a field-preemptive intent by granting the CFTC 'exclusive jurisdiction' over . . . 'swaps' traded on a [designated contract market].").

Kalshi's competitors that are in litigation against state regulators likewise have recognized that their CEA arguments are preemption defenses, not elements of a state complaint for violation of the gaming laws. *See, e.g.*, Polymarket's Preliminary Response 6, *Nevada v. Blockratize Inc.*, No. 26-cv-89 (D. Nev. Feb. 5, 2026) (ECF No. 2-4, at 28) (Polymarket contending that "[f]ederal law," including the CFTC's "exclusive jurisdiction,"

"preempts the application of state gambling laws to federally regulated contract markets");
*N. Am. Derivatives Exch., Inc. v. Nevada*, 2025 WL 2916151, at *1 (D. Nev. Oct. 14, 2025)
("Crypto contends that . . . Nevada law is preempted due to the CFTC's exclusive
jurisdiction over transactions on DCMs.").

    In this section of its notice of removal, Kalshi now conspicuously avoids calling its
argument a "preemption defense." But Kalshi cannot now magically transform its
preemption defense into something else. And it is well established that a preemption
defense is not a basis for removal. Cases "may not be removed to federal court on the basis
of . . . the defense of pre-emption." *Caterpillar*, 482 U.S. at 393; *see Negrete v. City of
Oakland*, 46 F.4th 811, 817 (9th Cir. 2022) (same). This is just a specific application of the
settled principle that a federal defense does not itself create "arising under" jurisdiction.
*See, e.g.*, *Hall v. N. Am. Van Lines, Inc.*, 476 F.3d 683, 687 (9th Cir. 2007); *Wayne*, 294 F.3d
at 1183. Thus, the mere assertion of a federal preemption defense does not provide a basis
for "arising under" jurisdiction.

    Kalshi relies (Notice ¶¶ 17–18) on two Nevada statutes cited in the Board's
complaint, NRS §§ 463.160(1), 465.086(1). According to Kalshi, these statutes show that
adjudicating the state causes of action necessarily requires deciding a question of federal
law. Kalshi is wrong.

    The first asserted provision is NRS § 463.160(1), which makes it "unlawful" for any
person to operate a gambling game or sports pool in Nevada "without having first
procured . . . all federal, state, county and municipal gaming licenses" that may be
required. NRS § 463.160(1). Kalshi argues that the reference to a "federal . . . license[s]"
means that a violation of this provision cannot be established without adjudicating federal
issues. That is incorrect. "[M]ere references to federal law in [a statute] do not convert the
claim into a federal cause of action." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 675 (9th
Cir. 2012). Here, the reference to a "federal" license is cumulative, meaning that the Board
can prove a violation of this provision based solely on Kalshi's lack of a state license (as the
Board alleges, Compl. ¶ 26). In other words, possessing a federal license does not make up

for the lack of a state license. Thus, this provision does not "necessarily raise" a federal issue. *Royal Canin*, 604 U.S. at 26.

Kalshi argues (Notice ¶ 17) that because it possesses a federal "license" (*i.e.*, its registration with the CFTC as a DCM), it does not need to possess a state license. To start, registration as a DCM is an authorization to operate a derivatives exchange, not a "gaming license[]." NRS § 463.160(1). In any event, no provision of state law says that having a federal gaming license exempts an entity from obtaining a state gaming license; instead, what Kalshi means is that it believes federal law preempts state law. It is black-letter law that a federal preemption defense cannot form the basis of federal-question jurisdiction, "even if both parties concede that the federal defense is the only question truly at issue." *Caterpillar*, 482 U.S. at 393. Section 463.160(1) thus does not create federal-question jurisdiction.

Kalshi's argument on the second provision, NRS § 465.086, fares no better. That provision states that, "[e]xcept as otherwise provided by law," it is unlawful for a person to receive compensation for accepting any bet or wager upon the result of a sporting event or other event unless it has procured and maintains all required "federal, state, county and municipal gaming licenses." NRS § 465.086(1). Kalshi first focuses on the "[e]xcept as otherwise provided by law" language. It contends that the CEA is a "law" that "provides" that it is not "required" to obtain a Nevada license. Notice ¶ 17.

Kalshi is mistaken. When a statute refers to "law" generally, the statute is presumed to refer "only . . . to the laws of the government" that passed the statute, *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 42 (1820) (opinion of Johnson, J.)—here, meaning Nevada law. Section 465.086 does not directly refer to any federal law, let alone the CEA—rather, Kalshi's argument presupposes that the CEA applies here, and this Court already has determined that it does not. *See Hendrick*, 2025 WL 3286282, at *1. But even if this language did refer to federal law, federal law does not provide an exception to state gaming law. The CEA does not say anything about compliance with Nevada gaming law—let alone provide that a DCM is exempt from all state licensing. *See Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*,

545 U.S. 308, 314 (2005). What Kalshi means—again—is that it believes federal law preempts Nevada's licensing regime as applied to it. But that is not a basis for federal-question jurisdiction.

And even if the CEA provided an exception to the state-law licensing requirement, the statutory phrasing "except as otherwise provided" indicates that this would be an affirmative defense to be raised and proved by Kalshi—not an element of the Board's claim. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025) (explaining the "general rule of statutory construction" that "a special exception to the prohibitions of a statute" is an affirmative defense (internal quotation marks omitted)); *Haddad v. State*, 2011 WL 1225795, at *2 (Nev. Jan. 13, 2011) ("[A] statutory exception is an affirmative defense where the statute first defines an offense in unconditional terms and then specifies an exception to its operation."). It is black-letter law that an affirmative defense cannot form the basis of federal-question jurisdiction. *Caterpillar*, 482 U.S. at 393. The "except as otherwise provided" clause thus does not create federal-question jurisdiction.

Kalshi also cites (Notice ¶ 17) Section 465.086(1)'s requirement that the party possess the necessary "federal" licenses in addition to "state, county and municipal gaming licenses." NRS § 465.086(1). This is the same argument that Kalshi makes with respect to NRS § 463.160(1), and it is wrong for the same reasons. As in Section 463.160(1), Section 465.086(1)'s license requirements are cumulative, so possessing one license does not excuse the absence of another. In other words, if Kalshi lacks a Nevada gaming license (which it does not dispute), then it violates Section 465.086 even if it has a federal license.

Kalshi cites (Notice ¶ 19) *Georgia Gambling Recovery LLC v. Kalshi Inc.*, 2026 WL 279375 (M.D. Ga. Feb. 3, 2026), but its reliance is misplaced. In that case, to succeed on its state-law cause of action, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.* at *2–3. Specifically, the Georgia law at issue provided that "[g]ambling contracts" were "void," and authorized recovery of "[m]oney paid . . . upon a gambling consideration" in connection with such contracts, O.C.G.A. § 13-8-3, and the Georgia Supreme Court had stated that whether a gambling contract was void under this

provision "depends on whether the contract is unlawful under the law governing its validity," *Georgia Gambling*, 2026 WL 279375, at *3 (citing *Talley v. Mathis*, 453 S.E.2d 704 (Ga. 1995)). As a result, to succeed on its state-law claim, the plaintiff had to prove that the challenged contracts were illegal under federal law. *See id.* at *2–3. Here, by contrast, the Board does not have to prove anything about Kalshi's compliance with federal law in order to prove that Kalshi violates Nevada gaming law.

Kalshi's expansive view of federal-question jurisdiction, if accepted, would mean that anytime a defendant raises a federal defense, there is "arising under" jurisdiction. It should be rejected for that reason. And if there were any doubt, principles of federalism foreclose Kalshi's removal attempt. Exercising federal-question jurisdiction here would upset the "balance of federal and state judicial responsibilities." *Bank of Am.*, 672 F.3d at 675. The Board brought this action "in state court to enforce its own state . . . laws," alleging only "state law causes of action, brought to protect Nevada residents." *Id.* at 676. Under these circumstances, the "claim of sovereign protection from removal arises in its most powerful form." *Id.* (citation omitted). The Court should be "reluctant to snatch" a case that "a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983). No such rule does. Nevada courts should adjudicate this matter, even if doing so requires them to contend with issues of federal law. *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 150 (1988). After all, the Supreme Court has long recognized that "state courts . . . are presumed competent to resolve federal issues." *Id.*

For all of these reasons, the Court should reject Kalshi's expansive theory of "arising under" jurisdiction.

## B.    The Board's State-Law Claims Are Not Completely Preempted

Kalshi next argues (Notice ¶¶ 23–25) that the "complete preemption" doctrine applies. This is not one of the exceedingly rare cases of complete preemption.

Complete preemption applies when "the pre-emptive force of the statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a

federal claim for purposes of the well-pleaded complaint rule." *City of Oakland v. BP PLC*, 969 F.3d 895, 905 (9th Cir. 2020) (internal quotation marks omitted). In that case, "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Wayne*, 294 F.3d at 1183. In other words, Congress has decided that this is an area that is so completely federal in nature that any case raising any issue related to the statute necessarily is a federal issue. The term complete "preemption" is a "misnomer," *Vegas*, 2024 WL 166759, at *4, because complete preemption it is a "jurisdictional" doctrine that requires state-law claims to be heard in federal court when the federal statutory scheme is "so comprehensive that it entirely supplants state law causes of action." *Saldana*, 27 F.4th 679, 686.

For complete preemption to apply, two requirements must be met. First, the statutory language must "indicate that Congress intended to preempt 'every state law cause of action within the scope' of" the relevant statute. *City of Oakland*, 969 F.3d at 907 (quoting *In re NOS Commc'ns, MDL No. 1357*, 495 F.3d 1052, 1058 (9th Cir. 2007)). This intent will not be lightly inferred: "[i]f Congress intends a preemption instruction completely to displace ordinarily applicable state law, and to confer federal jurisdiction thereby, it may be expected to make that atypical intention clear." *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 698 (2006). Second, the statute must provide a plaintiff "with a substitute cause of action, that is, a cause of action that would allow [plaintiffs] to remedy the wrong they assert they suffered." *City of Oakland*, 969 F.3d at 908 (brackets, quotation marks, and citations omitted). In other words, a federal statute must not only override state law, but also give plaintiffs a federal claim they can use in its place—one that lets them seek relief for the same alleged harm, just in federal court under federal law instead of under state law. *See id.* Unsurprisingly, given the extraordinary showing required, "[c]omplete preemption is rare." *Arco*, 213 F.3d at 1114. Indeed, the Supreme Court has "identified only three statutes that meet this criteria"—§ 301 of the LMRA, § 502 of ERISA, and §§ 85–86 of the National Bank Act. *City of Oakland*, 969 F.3d at 905.

Kalshi identifies no decision concluding that the CEA is one of the extraordinary situations where Congress intended complete preemption. To the contrary, a district court in Massachusetts rejected this exact argument when Kalshi made it in an attempt to remove a state-law enforcement proceeding brought by the Commonwealth of Massachusetts. *See* Order, *Massachusetts v. KalshiEX LLC*, No. 1:25-cv-12595 (D. Mass. Oct. 28, 2025) (ECF No. 34) (*Mass.* Order). As the court explained, the CEA lacks the "clear Congressional intent to displace state regulation" needed for complete preemption to apply. *Id.* The only other court that has addressed the issue came to the same conclusion. *See Farmers Co-op Elevator v. Doden*, 946 F. Supp. 718, 728–29 & n.4 (N.D. Iowa 1996) (noting CEA did not have the "necessary 'extraordinary' preemptive force" required for complete preemption).

For its complete preemption argument, Kalshi relies (Notice ¶ 24) solely on one provision in the CEA, 7 U.S.C. § 2(a). That provision states that "[t]he [CFTC] shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps. . . , traded or executed on a [designated] contract market." 7 U.S.C. § 2(a). But as this Court has explained, this provision does not apply here because Kalshi's sports event contracts are not swaps. *See Hendrick*, 2025 WL 3286282, at *3. And even if Section 2(a) did apply, nothing in that provision establishes clear congressional intent to displace all state causes of action that are conceivably related to the swaps traded on DCMs. To the contrary, Congress made clear that it had precisely the opposite intent, stating that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States *or any State*." 7 U.S.C. § 2(a)(1)(A) (emphasis added).[1] The Court's inquiry can end there. Where "a federal statute has a saving clause of this sort, Congress did not intend complete preemption, because 'there would be nothing . . . to "save"' if Congress

/ / /

---

[1]    Kalshi incorrectly asserts (Notice ¶ 24) that this savings clause is qualified by the phrase "[e]xcept as hereinabove provided." That is wrong. The phrase "except as hereinabove provided" qualifies only the *preceding* sentence, which describes the authority of federal and state regulatory agencies. 7 U.S.C. § 2(a)(1)(A). It does not qualify the sentence regarding state courts' jurisdiction.

intended to preempt every state cause of action within the scope of the statute." *City of Oakland*, 969 F.3d at 908.

Kalshi asserts that the "CEA supplies a federal cause of action that 'replaces the state cause of action.'" Notice ¶ 24 (quoting *Caterpillar*, 482 U.S. at 391 n.4). What is that cause of action? Kalshi never elaborates. The CEA is not a gaming statute, and it does not contain any provision that would provide equivalent relief to state gaming laws. Nothing in the CEA creates a federal cause of action to address the same unlawful conduct that the Board seeks to enjoin here, *i.e.*, engaging in unlicensed sports betting in violation of state law, without adhering to the safeguards that Nevada imposes to protect the public, and without paying the state taxes and fees. Thus, there is no federal cause of action that would allow the Board to "remedy the harm [it] assert[s] [it] suffered." *City of Oakland*, 969 F.3d at 908.

The Supreme Court and this Court have long recognized that the regulation of gaming "lie[s] at the heart of the state's police power." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 740 (9th Cir. 2003); *see Ah Sin*, 198 U.S. at 505-06; *Flynt v. Bonta*, 131 F.4th 918, 927 (9th Cir. 2025). Federal law "defer[s] to, and even promote[s], differing gambling policies in different States." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999); *see* 15 U.S.C. § 3001(a)(1)–(2). Kalshi thus would need to show exceptionally clear congressional intent to preempt state gaming law, and an even clearer intent to foreclose all state causes of action to enforce state gaming law and turn them into actions under the CEA. *Bond v. United States*, 572 U.S. 844, 858–59 (2014). It has not done so.

## C.   The Board Was Not Required to Join the CFTC

Finally, Kalshi argues that the Board should have named the CFTC as a defendant, and if the Board had done so, this Court would have jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Notice ¶¶ 26–27. Specifically, Kalshi contends that under NRS § 30.130, the Board was required to name the CFTC as a defendant in its request for a declaratory judgment, because the CFTC had an "interest which would be

affected by the declaration." *Id.* ¶ 26 (quoting NRS § 30.130). It argues that by failing to join the CFTC, the Board engaged in "artful pleading" to sidestep federal-agency jurisdiction. *See id.* ¶¶ 26–27. This argument is wrong.

NRS § 30.130 requires the plaintiff in a declaratory relief action to join any party with a "legal interest" in the action. *Wells*, 90 Nev. at 197–98. A party has a legal interest in an action if the action will adjudicate the party's legal "rights, duties or obligations" under Nevada law. *Id.* at 198. That the action might have a "practical" effect on the party is insufficient. *Id.* at 197 (internal quotation marks omitted).

Here, the CFTC has no legal interest in this case. The Board is trying to enforce Nevada gaming law against *Kalshi* because of its unlicensed operations in the State. The Board is not trying to enforce Nevada gaming law—or any state law—against the CFTC. Further, the CFTC does not face any legal exposure from the relief sought by the Board, which is a declaration that Kalshi's unlicensed gambling operations violate Nevada law and an injunction ordering Kalshi to stop its operations until it obtains a Nevada license and complies with Nevada requirements. In other words, this action will not adjudicate any of the CFTC's legal rights, duties, or obligations.

Kalshi asserts (Notice ¶ 26) that the CFTC has an "interest" in presenting a preemption argument that explains its view of its federal authority. That is not the type of legal interest that requires joinder. At most, the CFTC may be concerned about the practical effect of a decision in the Board's favor on Kalshi and other DCMs, but that does not implicate its own legal rights. If the CFTC wishes to provide its views, it could file an *amicus* brief. But an inchoate interest in a case is not enough to require joinder of a federal agency as a party.

Kalshi's argument, if accepted, would dramatically expand federal-officer removal. Under its theory, a federal agency would have a "legal interest" requiring joinder whenever the agency "claim[s]" an "interest" in the scope of its "jurisdiction." Notice ¶ 26. Once joined, the federal agency could claim that state law is preempted and force the removal of a state-law suit under 28 U.S.C. § 1442(a)(1), even though it is settled law that a preemption

defense does not represent a basis for removal. Kalshi cites no case permitting removal in remotely similar circumstances, and this Court should not be the first.

### E.    An Award of Attorneys' Fees is Appropriate

The Court should award the Board its attorneys' fees and costs incurred for this motion to remand. Under 28 U.S.C. § 1447(c), an order remanding a case "may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." Although attorneys' fees are not automatic, attorneys' fees are appropriate where the removal was not objectively reasonable. *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Assessing costs and fees for unreasonable removals deters defendants from abusing the removal process to unjustly delay litigation and impose unwarranted costs on plaintiffs. *Id.* at 140.

Kalshi's removal was not reasonable because this case plainly does not arise under federal law. *See* 28 U.S.C. § 1331. Kalshi's first ground for removing the Board's purely state-law-based complaint is a federal preemption defense, and a long line of settled precedent establishes that a federal defense (including a federal preemption defense) is not a basis for removal. Kalshi has itself recognized the argument is a preemption argument repeatedly in the federal court litigation it brought against the Board.

Kalshi's assertion that the complete preemption doctrine converts the Board's state-law complaint into a federal complaint likewise lacks merit. Kalshi does not identify any authority suggesting that the CEA is one of the few statutes with this extraordinary preemptive effect, nor does Kalshi provide any substantial reason to demonstrate how the doctrine's demanding requirements are met. Kalshi must show a clear intent to displace all state causes of action, but it cannot do that because the statute on which it relies has a savings clause that specifically preserves state-court jurisdiction. *See* 7 U.S.C. § 2(a)(1)(A). Further, Kalshi must show that federal law provides a cause of action to address the unlawful conduct at issue here (violation of state gaming law), *see City of Oakland*, 969 F.3d at 98, and Kalshi identifies no such provision. The only courts that have ever considered the argument have rejected Kalshi's position—including the federal court in

Massachusetts, which very recently rejected the exact argument Kalshi makes here. *See Mass.* Order.

Finally, Kalshi's claim that the CFTC was required to be joined as a defendant plainly lacks merit. The Board is seeking to stop Kalshi from offering unlicensed betting in Nevada. It is not seeking to enjoin the CFTC. The CFTC may have a generalized interest in the outcome of this case, but it has no legal interest that requires joinder, because adjudication of the Board's state-law claims against Kalshi will not decide any right, duty, or obligation of the CFTC. Kalshi points to no authority that supports removal under these circumstances.

The Board accordingly requests that this Court award fees and costs under 28 U.S.C. § 1447(c).

## CONCLUSION

The Court should remand this matter to the First Judicial District Court of Nevada, Carson City.

DATED this 18th day of February, 2026.

AARON D. FORD
Attorney General

By: */s/ Sabrena K. Clinton*
    Jessica E. Whelan (Bar No. 14781)
      Chief Deputy Solicitor General - Litigation
    Sabrena K. Clinton (Bar No. 6499)
      Senior Deputy Attorney General
    John S. Michela (Bar No. 8189)
      Senior Deputy Attorney General
    State of Nevada
    Office of the Attorney General
    jwhelan@ag.nv.gov
    sclinton@ag.nv.gov
    jmichela@ag.nv.gov

    *Attorneys for Plaintiff*